## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MENTOR ABI, LLC,** *d/b/a* **NEURORESTORATIVE LOUISIANA,** *Plaintiff*, <br><br> **VERSUS** <br><br> **TERRY DUFOUR, MYKE SLINKER, JAMAR BERRY, AND NEURO REHABCARE OF HAMMOND – LA, LLC** *d/b/a* **NEURO REHABCARE,** *Defendants*. | **CIVIL ACTION NO:** <br><br> **SECTION:** <br><br> **JUDGE:** <br><br> **MAGISTRATE:** |

### COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

NOW INTO COURT, through undersigned counsel, comes Plaintiff, MENTOR ABI, LLC, *d/b/a* NeuroRestorative Louisiana ("NeuroRestorative" or the "Company"), and files this Complaint for Injunctive Relief and Damages against Defendants, Terry Dufour ("Dufour"), Myke Slinker ("Slinker"), Jamar Berry ("Berry"), and Neuro RehabCare of Hammond – LA, LLC *d/b/a* Neuro RehabCare ("Neuro RehabCare"), and respectfully alleges as follows:

### INTRODUCTION

1.

NeuroRestorative provides a variety of inpatient rehabilitation and transitional living services to individuals suffering from brain and spinal cord injuries. From October 1, 2014 until August 4, 2017, NeuroRestorative entrusted Terry Dufour with the responsibility of running the day-to-day operations of its inpatient neurorehabilitation facility in Hammond. For several months *while* she was working as the senior managerial official at NeuroRestorative, Dufour secretly conspired to set up a competing business (Neuro RehabCare) less than 10 miles away. In doing so, she enlisted the assistance of her two lieutenants—Myke Slinker and Jamar Berry. Like

-1-

Dufour, both Slinker and Berry were managerial agents of NeuroRestorative while they were engaging in these improper actions. Dufour, Slinker, and Berry blatantly violated their duty of loyalty to NeuroRestorative as they took steps to poach NeuroRestorative's participants and employees and misuse confidential and proprietary information—all while serving as employees of NeuroRestorative. Their actions violated fiduciary, contractual, and statutory duties owed to NeuroRestorative and exhibited a callous indifference to the needs of the program's vulnerable participants. Through this action, NeuroRestorative seeks injunctive relief to prevent any further dissemination or use of misappropriated information, to require the return of such information, and to prevent any further recruitment/solicitation of its employees, as well as an award of monetary damages for the losses caused by Defendants' unlawful actions, as described more fully below.

## **PARTIES**

2.

Plaintiff, MENTOR ABI, LLC, *d/b/a* NeuroRestorative Louisiana, is a limited liability company organized under Delaware law that is licensed to do and currently doing business in the State of Louisiana under the trade name NeuroRestorative Louisiana. NeuroRestorative operates a fourteen-bed residential care facility located at 46406 West Lee Hughes Road, Hammond, Louisiana 70401.

3.

Defendant Terry Dufour is a former employee of NeuroRestorative who resides in Tangipahoa Parish, Louisiana, and may be served with process at 12049 Fairview Drive, Hammond, Louisiana 70403. Dufour is subject to personal jurisdiction in this Court because she is a citizen and resident of the State of Louisiana.

4.

Defendant Myke Slinker is a former employee of NeuroRestorative who resides in Livingston Parish, Louisiana, and may be served with process at 9906 Florida Boulevard, Walker, Louisiana 70726. Slinker is subject to personal jurisdiction in this Court because she is a citizen and resident of the State of Louisiana.

5.

Defendant Jamar Berry is a former employee of NeuroRestorative who resides in Tangipahoa Parish, Louisiana, and may be served with process at 127 Parkview Court, Ponchatoula, Louisiana 70454. Berry is subject to personal jurisdiction in this Court because he is a citizen and resident of the State of Louisiana.

6.

Dufour, Slinker, and Berry are hereinafter collectively referred to as the "Individual Defendants."

7.

Defendant, Neuro RehabCare of Hammond – LA, LLC, is a limited liability company organized under Delaware law that is licensed to do and currently doing business in the State of Louisiana under the trade name Neuro RehabCare. Neuro RehabCare may be served through its registered agent, Maurice Arbelaez, at 41238 Adams Road, Hammond, Louisiana 70403. Neuro RehabCare is subject to personal jurisdiction in this Court because it transacts business in Louisiana, has contracted to supply services within Louisiana, and has engaged in tortious conduct in Louisiana that has resulted and is continuing to result in injury and damage in Louisiana.

8.

Neuro RehabCare and the Individual Defendants are hereinafter collectively referred to as "Defendants."

## JURISDICTION AND VENUE

9.

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because NeuroRestorative asserts claims arising under, *inter alia*, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the Defend Trade Secrets Act, 18 U.S.C. § 1836, both of which are federal statutes. The Court has supplemental jurisdiction over NeuroRestorative's state law claims pursuant to 28 U.S.C. § 1367(a) because they are so related to NeuroRestorative's claims under federal law that they form part of the same case or controversy.

10.

This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this is a civil action between citizens of different states, and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.  NeuroRestorative is a citizen of Massachusetts for purposes of federal diversity jurisdiction.  The Individual Defendants are citizens of Louisiana for purposes of federal diversity jurisdiction.  Neuro RehabCare is a citizen of Kansas for purposes of federal diversity jurisdiction.

11.

Venue is proper pursuant to 28 U.S.C. § 1391 because the acts giving rise to NeuroRestorative's claims occurred primarily in Tangipahoa Parish, which is located within the Eastern District of Louisiana.

## FACTUAL ALLEGATIONS

12.

NeuroRestorative is a member of The MENTOR Network, which is a national network of local health and human services providers offering quality, community-based services to vulnerable individuals.   NeuroRestorative's facility in Hammond, Louisiana is an inpatient residential care facility providing neurorehabilitation and transitional living services for participants with brain and spinal cord injuries.

13.

As a health care facility, NeuroRestorative is subject to the Health Insurance Portability and Accountability Act ("HIPAA"), a federal statute which requires health care providers and their business associates to implement procedures to ensure the confidentiality and security of protected health information of their patients.

14.

Dufour was employed by NeuroRestorative from approximately October 29, 2012, until August 4, 2017.  She was hired as a Clinical Evaluator at the Company's Hammond facility.  She held this position until approximately October 1, 2014, when she was promoted to the position of Program Director.   Dufour served as Program Director for the Hammond facility until her resignation on August 4, 2017.

15.

Slinker was employed by NeuroRestorative from approximately February 9, 2015, until her resignation on July 14, 2017.  She was a Residential Supervisor at the Hammond facility, but she also handled many of the functional responsibilities of a Case Manager.

16.

Berry was employed by NeuroRestorative from approximately August 6, 2012, until his resignation on August 12, 2017.  Berry was a Life Skills Trainer at NeuroRestorative's Hammond facility from his date of hire until approximately November 17, 2013, when he was promoted to the position of Residential Supervisor.  Berry served as a Residential Supervisor for the Hammond facility until his resignation.

17.

As managerial officials of NeuroRestorative's Hammond facility, the Individual Defendants were responsible for overseeing the Company's day-to-day affairs and had access to substantial amounts of protected patient health information, trade secrets, and other confidential and proprietary information, including, but not limited to, client/participant lists and contact information, client/participant medical and treatment information, contracts or other agreements, employee pay information and disciplinary records, recruitment and retention plans, marketing plans, business plans, business methods and strategies, reimbursement rates, operational information, audit procedures, training programs and details related thereto, quality assurance programs and procedures, and risk management plans.

18.

In or around June 2016, Dufour met Maurice Arbelaez, an executive with a healthcare company based in Overland Park, Kansas.

19.

After a series of meetings and/or telephone calls, Dufour and Arbelaez formulated a plan to set up a competing neurorehabilitation facility in Hammond using NeuroRestorative's resources

-6-

and confidential information, and to divert NeuroRestorative's participants and employees to the new facility to ensure its stability and success.

20.

Dufour enlisted the assistance of both Slinker and Berry in connection with this scheme while all three were still employed as managerial representatives of NeuroRestorative.

**Slinker's Resignation**

21.

On July 5, 2017, Slinker notified NeuroRestorative that she was resigning.   In her resignation letter, Slinker stated that she was resigning because her daughter "was experiencing some health issues" that required her assistance and that her last day of employment would be July 14, 2017.

22.

Upon information and belief, the reason provided by Slinker was deceptive —  the actual reason Slinker resigned was to work for the newly-formed Neuro RehabCare and to begin the process of recruiting NeuroRestorative employees to work for Neuro RehabCare.

**Dufour's Resignation**

23.

During approximately the last three months of Dufour's employment, she was frequently away from the work-site, and when she was there, Dufour was insufficiently attentive to the needs of her employees and the program's participants.

24.

Upon information and belief, Dufour was surreptitiously spending significant amounts of time away from her job with NeuroRestorative during normal working hours and — while being

compensated by NeuroRestorative—setting up her competing business on behalf of Neuro RehabCare.

25.

By at least June 2017 (and possibly earlier), Dufour was actively engaged in running the operations of Neuro RehabCare while still employed by NeuroRestorative and participated in conference calls and meetings during which Neuro RehabCare's budget and staffing needs, among other business-related topics, were addressed.

26.

On Thursday, August 3, 2017, NeuroRestorative's Vice President of Operations, Jane Imboden, received a phone call from a representative of a residential care facility in Covington, Louisiana.  This individual informed Imboden that Maurice Arbelaez was starting a competing neurorehabilitation program at 41238 Adams Road in Hammond, and that Dufour was involved with the new program and had been actively recruiting staff to work there.  The individual contacted Imboden because she was shocked that Dufour would engage in such conduct while working for NeuroRestorative and thought it was important that Imboden be informed.

27.

The next morning, Imboden reported this information to NeuroRestorative's Human Resources Department for further investigation.  After reviewing Dufour's NeuroRestorative email account, it was discovered that Dufour and Arbelaez had been communicating electronically with one-another going back as far as June 2016 about opening up a competing facility.

28.

Later that afternoon, Imboden and NeuroRestorative's Senior Director of Human Resources, Bob Moritz, called Dufour to question her about her activities.  Dufour repeatedly and

falsely denied having any knowledge of or involvement with setting up a new neurorehabilitation facility and insisted that she did not know Arbelaez.

29.

Less than an hour after making those bold, and false, denials, Dufour resigned from NeuroRestorative.  She notified the Company of her decision at approximately 5:30 p.m. on Friday, August 4, 2017.

### Berry's Resignation

30.

On or about Monday, August 7, 2017, Berry told NeuroRestorative that Dufour had solicited him to leave NeuroRestorative to work for her at Neuro RehabCare and offered Berry more money than he had been earning at NeuroRestorative.  He told NeuroRestorative that he had not yet made up his mind whether he was going to accept Dufour's offer.

31.

Two days later, on or about August 9, 2017, Berry represented to NeuroRestorative that he needed medical leave due to an alleged serious health condition and provided a physician's note stating that he would need to miss two weeks of work.  NeuroRestorative preliminarily agreed to provide Berry with the requested leave.

32.

Upon information and belief, Berry was actively working for Neuro RehabCare while he was supposedly on a "medical" leave and continuing to be compensated by NeuroRestorative.

33.

 On August 12, 2017—just three days after he requested two weeks of medical leave—Berry sent a text message notifying the Company that he was resigning.

**Illicit Conduct of the Individual Defendants**

34.

The Individual Defendants (and others acting at the direction of the Individual Defendants) each used their NeuroRestorative email accounts to transmit files containing statutorily protected patient information, trade secrets, and other highly confidential and proprietary information to their personal email accounts in the months leading up to their resignations. These materials were used to assist them in their attempts to recruit NeuroRestorative employees and to divert NeuroRestorative participants to Neuro RehabCare.

35.

Dufour and Slinker systematically recruited NeuroRestorative employees to leave their jobs with the Company and join Neuro RehabCare.

36.

As a result of Dufour and/or Slinker's recruitment efforts, at least six individuals, who were employed as Life Skills Trainers at NeuroRestorative's Hammond facility, abruptly resigned and accepted jobs working at Neuro RehabCare in the days leading up to and following Dufour's resignation: (1) Rose Jackson (resigned on August 7, 2017); (2) Samantha Self (resigned on August 1, 2017); (3) Taylor Crumb (resigned on August 12, 2017); (4) Chelsea Cohen (resigned on August 11, 2017); (5) Shelly Cali (resigned on August 8, 2017); and (6) Tina Cruz (resigned on August 11, 2017).

37.

Dufour and Slinker strategically targeted Life Skills Trainers, in particular, in their recruitment efforts because they knew that these individuals had close relationships with NeuroRestorative's participants and their families and recognized that having competent, highly-

skilled employees who were already familiar with the participants on staff would assist the Individual Defendants in soliciting the participants to transfer services from NeuroRestorative's facility to Neuro RehabCare.

38.

Both Slinker and Dufour instructed the employees who were offered employment at Neuro RehabCare to not mention their job offers to anyone at NeuroRestorative.

39.

Just hours after resigning, Dufour contacted a physical therapy assistant from NeuroRestorative's Hammond facility and attempted to persuade him to come work for Neuro RehabCare.

40.

The next day, Dufour attempted to recruit a speech therapist from the Hammond facility to leave NeuroRestorative and join Neuro RehabCare. Dufour also instructed the speech therapist to lie to an executive of NeuroRestorative if asked about their conversation.

41.

Upon information and belief, Dufour was also responsible for recruiting both Slinker and Berry, as well as LPN Stephanie Helsley (resigned on August 10, 2017); LPN Stephanie Lanier (resigned on August 20, 2017); and Occupational Therapist Britney Rose (resigned on July 16, 2017), to leave their jobs with NeuroRestorative and join Neuro RehabCare. Dufour's recruiting activities with respect to these individuals occurred both during and after she was employed as NeuroRestorative's Program Director.

42.

While engaging in these employee recruitment activities, Dufour and Slinker improperly utilized confidential personnel and compensation information belonging to NeuroRestorative to gain a competitive advantage on behalf of Neuro RehabCare.

43.

Upon information and belief, Dufour and Slinker offered compensation packages that they knew were greater than those previously provided by NeuroRestorative to each and every one of the targeted employees.

44.

Additionally, Dufour—while she was still employed by NeuroRestorative as its Program Director and had access to the Company's confidential information—directly solicited multiple participants from the Company's Hammond facility to transfer to Neuro RehabCare. This process started long before NeuroRestorative learned of her activities in early August 2017.

45.

Upon information and belief, Dufour—either directly or through other agents of Neuro RehabCare—targeted long-term participants of NeuroRestorative whose funding came principally from private sources, rather than governmental programs. Because of the information that she learned in her position with NeuroRestorative, Dufour knew that these particular individuals, due to the sources of their funding and other factors, would provide a sufficient source of revenue to secure stable resources to support the launch of Neuro RehabCare and that the loss of these participants would be particularly damaging to NeuroRestorative.

46.

On or about March 27, 2017, Dufour sent an email from her NeuroRestorative account to her personal email account that contained an attachment consisting of the following confidential and proprietary information belonging to NeuroRestorative:  a list of names, phone numbers, and email addresses of various individuals, including marketing contacts; case managers; adjusters; hospital contacts and discharge planners; vendor contacts from equipment/supply companies; governmental licensing and inspection contacts; and contacts from various other service providers who performed work at the NeuroRestorative facility in Hammond.

47.

Upon information and belief, Dufour used this information to the detriment of her employer NeuroRestorative in furtherance of her plan to convince participants to transfer services to Neuro RehabCare.

48.

In June and July 2017, Dufour directly solicited the guardians/families of multiple participants to transfer to Neuro RehabCare—again, all while she was still employed by NeuroRestorative and had access to the Company's confidential information and HIPAA-protected information about the participants.

49.

While still employed by NeuroRestorative, Dufour took the parents/guardians of two participants [B.P. and B.A.] to dinner for the express purpose of recruiting them to transfer to Neuro RehabCare and fraudulently submitted the expenses incurred in connection with those meetings to NeuroRestorative for reimbursement as company-related business expenses. Those participants later left NeuroRestorative for Neuro RehabCare.

50.

Upon information and belief, Dufour enlisted another NeuroRestorative employee—Stephanie Helsley—to assist her in soliciting NeuroRestorative participants on behalf of Neuro RehabCare.

51.

While she was still employed by NeuroRestorative and during her normal working hours, Helsley escorted two such participants [K.E. and A.B.] on a tour of Neuro RehabCare's facility and provided false information to her NeuroRestorative co-workers regarding her whereabouts at the time.

52.

In connection with the efforts to recruit participants while employed by NeuroRestorative, Dufour and Berry made a series of misrepresentations to participants and their families, including, but not limited to, the following:

(a)    Dufour promised one participant [J.L.] that he could have an apartment at Neuro RehabCare while knowing full well that J.L.'s medical limitations would not allow this;

(b)    Dufour and Berry misled another participant [K.E.] into believing that NeuroRestorative could not assign him an apartment because his wheelchair would not fit through the door at the available NeuroRestorative apartment, and used that information to convince him to move to Neuro RehabCare; and

(c)    after communicating with Dufour and Berry, at least one family member of a participant [M.M.] was left with the impression that Neuro RehabCare was merely a new location associated with NeuroRestorative, and not a competing entity.

53.

Berry—while he was still employed by NeuroRestorative and had access to its confidential information—solicited the mother of one of NeuroRestorative's participants [B.P.] to transfer to Neuro RehabCare's new facility in Hammond.

54.

On August 7, 2017, the very next business day after Dufour's resignation, two NeuroRestorative participants, through their legal guardians, provided notice of their intent to move to Neuro RehabCare.  Over the next few days, three additional participants provided similar notice.

55.

On August 11, 2017—less than a week after Dufour resigned from NeuroRestorative—Dufour's husband and teenage son were among those individuals involved with physically moving and transporting five of NeuroRestorative's eleven participants to the Neuro RehabCare facility. Four out of the five transferring participants verbally expressed that they did not want to leave NeuroRestorative, both to NeuroRestorative's staff and to a third-party nursing professional.

56.

Subsequent to the foregoing events, NeuroRestorative also discovered that a binder containing confidential and protected patient health information is missing from one of the vans from NeuroRestorative's Hammond facility.  The binder contains comprehensive patient information for each program participant, including each participant's full legal name, social security number, blood type, insurance information, next of kin, allergies, and dietary restrictions.

57.

Upon information and belief, Berry was the last person to have access to the binder before it went missing.

58.

Upon information and belief, Defendants used the contents of the missing binder in furtherance of their efforts to set up a competing business.

59.

Upon information and belief, Defendants are also in possession of the following confidential and proprietary materials of NeuroRestorative, which have been used in connection with their unlawful actions in recruiting and training new employees and soliciting participants while employed by NeuroRestorative on behalf of Neuro RehabCare: new hire training syllabus and related materials; job descriptions for various positions at NeuroRestorative; NeuroRestorative Field Assessment form; NeroRestorative staff meeting sign-in sheets; staff meeting minutes; weekly activity schedules; biological spill kit procedures; participant and family contact information; skin inspection report; participant orientation manual; NeuroRestorative admission packet; medication administration reports for at least two participants; and new hire employment orientation packages.

**The Individual Defendants' Contractual Obligations to NeuroRestorative**

60.

NeuroRestorative has developed significant amounts of non-public, patient health information, as well as trade secrets and other confidential and proprietary information regarding the services it provides, including, but not limited to, patient/participant lists; the funding sources for the long-term care of specific patients/participants; information related to the care and

preferences of specific patients/participants; strategies for effective patient/participant care; training materials; patient/participant admission and orientation manuals; and strategic marketing plans, just to name a few.

61.

NeuroRestorative actively seeks to preserve the confidentiality of its trade secrets and confidential and proprietary information by, *inter alia*, requiring any employee who has access to such information to enter into a confidentiality and non-disclosure agreement as a condition of employment. The Company has also promulgated policies for this purpose.

62.

The Individual Defendants each entered into a Confidentiality and Non-Disclosure Agreement ("NDA") setting forth various duties they owed to NeuroRestorative over the course of their employment, as well as establishing certain restrictions on their activities after leaving the Company.

63.

 Dufour entered into her most recent version of the NDA with NeuroRestorative on June 15, 2016. She had entered into a previous version on November 7, 2012.

64.

Slinker entered into her most recent version of the NDA with NeuroRestorative on June 20, 2016. She had entered into a previous version on February 12, 2015.

65.

Berry entered into his most recent version of the NDA with NeuroRestorative on June 24, 2016. He had entered into a previous version on November 15, 2014.

66.

The terms of each NDA provide that the agreement is between the employee signing the document and "The MENTOR Network," which is specifically defined as "the applicable corporate entity that is a partner of The MENTOR Network and which employs [the signing employee] on a local level."

67.

The applicable corporate entity that is a partner of The MENTOR Network and which employed each of the Individual Defendants on a local level is NeuroRestorative Louisiana, a trade name of MENTOR ABI, LLC.  In addition, each of the Individual Defendants is and was fully aware of the entity that employed them and its association with The Mentor Network.

68.

Paragraph 1 of the NDA governs the use of confidential information obtained by the Individual Defendants as a result of their employment with NeuroRestorative and states:

1.    **Confidential Information.** You acknowledge that, as a result of your employment with The Network, you have had or will have access to confidential and non-public information concerning, without limitation the Network, its affiliates, its local providers, its funders, its vendors, its employees, its independent contractors, individuals who receive services from The Network, and their guardians and families (collectively, "Confidential Information"). Confidential Information includes, but is not limited to, medical and treatment information, contracts or other agreements, recruitment and retention plans, marketing plans, business plans, business methods and strategies, reimbursement rates, operational information, audit procedures, training programs and details related thereto, quality assurance programs and procedures, and risk management plans.

You agree that, effective immediately, during your employment with the Network and for a period of **two (2) years** following the cessation of your employment for any reason, you shall hold in strictest confidence and shall not use in a competitive manner, nor disclose to any person, firm, corporation, partnership, agency,

commission, institution, or other entity that is engaged in or associated with business activities that are the same as, or substantially similar to, the Network's business, any Confidential Information, except as may be required in the course of performance of your duties for the Network. This Acknowledgement does not limit any longer period of protection or the remedies available under applicable common or statutory law, which may impose longer duties of non-disclosure.

Immediately upon termination of your employment with the Network, whether voluntary or involuntary, or at any other time designated or requested by the Network, you will immediately surrender to the Network, without demand, all items which contain or constitute Confidential Information or Trade Secrets, whether written or electronic, as well as all originals and all copies of all manuals, memoranda, notes, records, files and other documents obtained by you during your employment with the Network which relate in any way to the Network, its businesses and operations, and its customers and suppliers. You acknowledge that such information is, and shall remain, the property of the Network.

You further acknowledge that you have obligations under the federal HIPAA law to keep confidential all health information regarding any individual served by The Network and that The Network may report HIPAA violations as necessary to enforce the requirements of that law. Please note that nothing in this Acknowledgement prohibits you from truthfully: (a) reporting possible violations of federal or state laws or regulations to any governmental agency or entity, including but not limited to state child and adult protective services agencies, the Department of Justice, the Securities and Exchange Commission, or any Inspector General; (b) making other disclosures that are protected under state or federal whistleblower provisions; or (c) cooperating in ongoing investigations conducted by any such governmental agency or entity.

69.

The Individual Defendants also acknowledged that they each received a copy of NeuroRestorative's Employee Information Guide, which includes the following policy regarding the handling of confidential information:

## Confidentiality

During your employment, you will be entrusted with confidential information about the Company and the individuals you serve. As a condition of your employment, you are required to sign a confidentiality and non-disclosure agreement, which may also contain a nonsolicitation provision depending on your position. The protection of this confidential information in whatever form it takes — verbal, written, or electronic — is vital to the interests and success of The Network.

"Confidential Information" includes, but is not limited to the following non-public information:

- Information on individuals served, including health-related information that is subject to the privacy requirements of the Health Insurance Portability and Accountability Act (HIPAA)

- Company business plans and strategies

- Files of the individuals we serve

- Financial information that is not publicly available

- Training programs and support plans

- Employee referral source information

- Individuals served referral source information

- Company marketing plans and strategies

You may not, either directly or indirectly, divulge, disclose, or communicate to any person or corporation information that is protected by HIPAA; by local, state, or federal laws governing trade secrets, intellectual property rights, or privacy; or by other similar limitations on communication. This prohibition shall apply to the individuals we support, their records, and the private business of the Company. You may not use or convert, or be complicit in someone else's use or conversion of, any Confidential Information, including but not limited to business plans and Company policies and practices, for use in a competing business.

Accidental disclosure of Confidential Information can be as harmful as intentional disclosure. The safest practice is simply to avoid disclosure of such subjects with anyone who does not need the information in order to conduct Network business. It is your

responsibility to exercise proper care in preparing documents containing Confidential Information and in circulating and maintaining them in a secure manner. Confidential documents should be so marked and should be circulated in a similarly marked, sealed envelope. If you improperly use or disclose Confidential Information, you may be subject to discipline, up to and including immediate termination of employment.

70.

Each of the Individual Defendants also received a copy of NeuroRestorative's Code of Conduct, which contains the following information regarding the Company's confidential information:

*MAINTAIN CONFIDENTIALITY*

As part of your job, it is likely that you will be entrusted with certain confidential information during the course of your employment. This may include, for example, private information such as health information or Social Security Numbers, or information about Company contracts and reimbursement rates. You are expected to abide by all Company policies regarding privacy and security of confidential information including those pursuant to state laws and the federal Health Insurance Portability and Accountability Act of 1996 (HIPAA).

The following are some of the requirements you must follow regarding confidentiality at The Network:

- You must not disclose or use confidential information for any purpose other than Company business, either during or after your employment with the Company. This means that you should not share confidential information you receive by virtue of your work responsibilities with any outside competitor or company.

- Information regarding individuals receiving services from The MENTOR Network is confidential and may be shared only in accordance with appropriate authorization.

- All employees are required to respect professional confidences and work to support procedures that will safeguard the confidentiality and privacy of individuals served. For example, you should not

discuss the individuals we serve in public or in areas where other people we serve or third parties can overhear. Any written, confidential information should be maintained appropriately and not visible to anyone without a right or a need to know the information.

Inappropriate disclosure of confidential information could lead to corrective or disciplinary action, including termination of employment, as well as other possible legal action.

71.

The NDAs also contain a non-solicitation provision that prohibits the Individual Defendants from recruiting or soliciting NeuroRestorative's employees on behalf of a competing business, both during their employment, and for a period of one (1) year from their respective termination dates. The employee non-solicitation provisions in the Individual Defendants' NDAs are all identical and state as follows:

> **3.     Non-Solicitation and Non-Interference**.  During your employment with the Network and for a period of one (1) year after the voluntary or involuntary termination of your employment with the Network, you shall not, directly or indirectly, on your own behalf or on behalf of any third party:
>
> (a) recruit, solicit, hire, or attempt to recruit, solicit or hire any person who, when your employment with the Network ceased, had been an employee of the Network within a **one (1) year** period preceding the date on which your employment with the Network ceased, for the purpose of encouraging, enticing, or causing said employee to terminate employment with the Network in order to perform competitive services for competitive companies. You further acknowledge that such other employees of the Network may be similarly bound by agreements with the Network and that you shall not induce or attempt to induce, either directly or indirectly, a breach of the duties owed by such other employees to the Network . . .[1]

---

[1] Although each of the NDAs also contains covenants not to compete or to solicit clients, NeuroRestorative is not seeking to enforce those specific covenants in the instant lawsuit.  It is, however, seeking to enforce the provisions relating to misuse of confidential information and recruiting employees.

72.

The Individual Defendants approved and agreed to be bound by the terms of their respective NDAs using an electronic signature system located on NeuroRestorative's web-based employee portal. The Individual Defendants each electronically signed their agreements by logging into the employee portal using their assigned employee identification numbers and personal passwords and then selecting a box indicating that they had read and agreed to the terms of their NDAs.

73.

The electronic signature system on the NeuroRestorative employee portal complies in all respects with the requirements of the federal Electronic Signatures in Global and National Commerce Act ("ESIGN"), 15 U.S.C. § 7001, *et seq.*, and the Louisiana Uniform Electronic Transaction Act ("LUETA"), La. Rev. Stat. § 9:2601, *et seq.*

## FIRST CAUSE OF ACTION: BREACH OF FIDUCIARY DUTY

### (AGAINST INDIVIDUAL DEFENDANTS)

74.

NeuroRestorative re-alleges and incorporates by reference all allegations set forth in the preceding paragraphs.

75.

NeuroRestorative entrusted the Individual Defendants to manage its affairs at the Hammond facility and to oversee the care of its vulnerable participants.

76.

The Individual Defendants were fiduciaries of NeuroRestorative and – at all times prior to their resignations – owed the Company a duty of loyalty.

77.

The Individual Defendants have engaged in grossly unethical and unlawful behavior and breached their fiduciary duties by misappropriating NeuroRestorative's trade secrets and confidential patient information and using them to form a competing business modeled after NeuroRestorative and unlawfully diverting NeuroRestorative's long-time participants and employees for their own personal gain and that of Neuro RehabCare.

78.

As a direct and proximate result of the Individual Defendants' wrongful conduct, NeuroRestorative has suffered and continues to suffer damages, including, but not limited to, the loss of its trade secrets; loss of market share, revenue and profits; damage to business reputation; and loss of client goodwill.

## SECOND CAUSE OF ACTION:  BREACH OF CONTRACT

### (AGAINST INDIVIDUAL DEFENDANTS)

79.

NeuroRestorative re-alleges and incorporates by reference all allegations set forth in the preceding paragraphs.

80.

The Individual Defendants each agreed to be bound by the terms of their respective NDA agreements with NeuroRestorative, including, for purposes of this litigation, the agreements' confidentiality and non-solicitation provisions.

81.

As part of their agreements with the Company, the Individual Defendants each promised that they would not use or disclose NeuroRestorative's confidential information—including client

names, contact information, and medical information—both during and for at least two years after their termination dates.

82.

The Individual Defendants also promised to promptly return all of NeuroRestorative's property—including any electronic files or copies of any documents containing confidential information—as soon as their employment relationships with NeuroRestorative ended.

83.

Under the terms of their agreements with NeuroRestorative, the Individual Defendants agreed to refrain from soliciting or recruiting any of NeuroRestorative's employees, both during and for at least one year after their termination dates.

84.

The Individual Defendants have breached their agreements with NeuroRestorative by recruiting employees of NeuroRestorative; retaining copies of proprietary business and training materials acquired during their employment; emailing numerous computer files containing highly confidential and proprietary business information to their personal email accounts; and then using such materials and information to form a competing business and unlawfully divert NeuroRestorative's long-term participants.

85.

By breaching their NDAs, the Individual Defendants have caused and will continue to cause NeuroRestorative to suffer substantial, immediate, and irreparable harm, as the Individual Defendants themselves acknowledged in Paragraph 5 of their respective NDA agreements.

86.

NeuroRestorative has no adequate remedy at law for the foregoing irreparable harm.

87.

As a direct and proximate result of the Individual Defendants' wrongful conduct, NeuroRestorative has suffered and continues to suffer damages, including, but not limited to, the loss of its trade secrets, loss of market share, lost revenue and profits, damage to business reputation, and loss of client goodwill, for which the Individual Defendants are liable.

88.

Because they acted in bad faith in breaching their duties under the NDAs, the Individual Defendants are liable for all damages, foreseeable or not, that are a direct consequence of their failures to perform, as provided by La. Civ. Code art. 1997.

89.

NeuroRestorative is also entitled to recover its reasonable costs and attorneys' fees incurred in connection with this action, as provided under Paragraph 5 of the Individual Defendants' agreements.

## THIRD CAUSE OF ACTION:
## <u>VIOLATION OF THE LOUISIANA UNIFORM TRADE SECRETS ACT</u>

### (AGAINST ALL DEFENDANTS)

90.

NeuroRestorative re-alleges and incorporates by reference all allegations set forth in the preceding paragraphs.

91.

The non-public patient health information and other confidential and proprietary information and materials that NeuroRestorative provided to the Individual Defendants in

connection with their employment are "trade secrets" within the meaning of the Louisiana Uniform Trade Secrets Act ("LUTSA"), La. Rev. Stat. § 51:1431, *et seq*.

92.

NeroRestorative has rightful legal or equitable title to, or license in, the aforementioned trade secrets.

93.

NeuroRestorative's trade secrets derive actual and potential independent economic value based on the fact that they are neither generally known to, nor readily ascertainable through proper means by individuals outside of the Company, who would financially benefit from their use or disclosure. The value of Plaintiffs' trade secrets is particularly heightened given the highly-regulated and highly-competitive nature of Plaintiffs' business.

94.

The Individual Defendants have misappropriated NeuroRestorative's trade secrets by retaining copies of proprietary business and training materials from their employment with NeuroRestorative; emailing numerous computer files containing highly confidential and proprietary business information to their personal email accounts; and then using such materials and information to form a competing business and unlawfully divert NeuroRestorative's long-term clients, in violation of the Louisiana Uniform Trade Secrets Act ("LUTSA"), La. Rev. Stat. § 51:1431, *et seq*.

95.

The aforementioned materials and information are not known by or available to individuals outside of NeuroRestorative, and they provide the company with a competitive advantage over other businesses that operate similar residential care facilities.

96.

NeuroRestorative took reasonable steps to preserve this competitive advantage by, *inter alia*, limiting access to its confidential and proprietary information and obtaining commitments from the Individual Defendants that they would return any such information in their possession at the end of their employment with the company.

97.

The Individual Defendants have used NeuroRestorative's trade secrets to form a competing business modeled after NeuroRestorative and to unlawfully divert NeuroRestorative's long-term clients and employees to Neuro RehabCare.

98.

Neuro RehabCare knew or should have known that the aforementioned materials and information were trade secrets belonging to NeuroRestorative, and that the Individual Defendants were not authorized to possess, disclose, or use such materials or information after resigning from NeuroRestorative.

99.

By knowingly accepting NeuroRestorative's misappropriated trade secrets and other confidential and proprietary information from the Individual Defendants and using such secrets and information to unfairly compete with NeuroRestorative, Neuro RehabCare misappropriated NeuroRestorative's trade secrets, within the meaning of La. Rev. Stat. § 51:1431(2).

100.

Defendants' unlawful acts have caused and will continue to cause NeuroRestorative to suffer substantial, immediate, and irreparable harm, for which NeuroRestorative has no adequate remedy at law.

101.

NeuroRestorative is entitled to temporary and permanent injunctive relief against any further acts in violation of the LUTSA by Defendants, as well as a mandatory injunction requiring Defendants to take affirmative actions to protect NeuroRestorative's trade secrets, as provided by La. Rev. Stat. § 51:1432.

102.

Defendants' acts of misappropriation have also caused NeuroRestorative to suffer damages, including, but not limited to, the loss of its trade secrets, lost revenue and profits, damage to business reputation, and loss of client goodwill.

103.

NeuroRestorative is entitled to recover damages for all losses caused by or that may be caused in the future by Defendants' acts of misappropriation, as well as for any unjust enrichment Defendants have received as a result of their acts of misappropriation that is not otherwise accounted for in the damages awarded for NeuroRestorative's actual loss, as provided by La. Rev. Stat. § 51:1433.

104.

Because Defendants acted willfully and maliciously in misappropriating and using NeuroRestorative's trade secrets and other confidential and proprietary information, NeuroRestorative is entitled to an award of attorneys' fees, as provided by La. Rev. Stat. § 51:1434.

## FOURTH CAUSE OF ACTION:
## <u>VIOLATION OF THE FEDERAL DEFEND TRADE SECRETS ACT OF 2016</u>

### (AGAINST ALL DEFENDANTS)

105.

NeuroRestorative re-alleges and incorporates by reference all allegations set forth in the preceding paragraphs.

106.

As part of their employment with NeuroRestorative, the Individual Defendants assumed a legal duty not to use or disclose NeuroRestorative's trade secrets and other confidential and proprietary information, except as required to perform their duties as employees of NeuroRestorative.

107.

As fiduciaries of NeuroRestorative, the Individual Defendants assumed a special duty to maintain the secrecy of the Company's trade secrets and other confidential and proprietary information and to refrain from using such secrets and information except in furtherance of NeuroRestorative's business interests.

108.

The Individual Defendants have misappropriated NeuroRestorative's trade secrets by, *inter alia*, retaining copies of proprietary business and training materials from their employment with NeuroRestorative; emailing files containing confidential and proprietary business information to their personal email accounts; using and/or disclosing such materials and information to form a competing business (Neuro RehabCare) and unlawfully divert NeuroRestorative's participants and employees, and disclosing such materials and information to individuals associated with Neuro

RehabCare, all in in violation of the federal Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836, *et. seq.*

109.

The Individual Defendants each used improper means to acquire and retain possession of NeuroRestorative's trade secrets and other confidential and proprietary information, in violation of their contractual, fiduciary, and other legal duties to NeuroRestorative.

110.

Moreover, Neuro RehabCare knew or should have known that the aforementioned materials and information were trade secrets belonging to NeuroRestorative, and that the Individual Defendants were not authorized to possess, disclose, or use such materials or information after resigning from NeuroRestorative. Accordingly, the acquisition and use of NeuroRestorative's trade secrets and other confidential and proprietary information by Neuro RehabCare constitutes misappropriation of NeuroRestorative's trade secrets, in violation of the DTSA.

111.

The DTSA provides the owner of a misappropriated trade secret with a private civil action "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

112.

The materials and trade secrets misappropriated by Defendants are related to services used in or intended for use in interstate commerce, including, but not limited to, the rehabilitation and transitional living services provided at the various facilities owned by NeuroRestorative across the country.

113.

Defendants' unlawful acts have caused and will continue to cause NeuroRestorative to suffer substantial, immediate, and irreparable harm, for which NeuroRestorative has no adequate remedy at law.

114.

NeuroRestorative is entitled to temporary and permanent injunctive relief against any further acts in violation of the DTSA by Defendants, as well as a mandatory injunction requiring Defendants to take affirmative actions to protect NeuroRestorative's trade secrets, as provided by 18 U.S.C. § 1836(b)(3)(A).

115.

NeuroRestorative is entitled to recover all actual damages it has suffered and may suffer in the future as a result of Defendants' acts of misappropriation, as well as disgorgement of any unjust enrichment realized by Defendants as a result of their unlawful acts, that is not otherwise addressed in computing damages for actual loss pursuant to 18 U.S.C. § 1836(b)(3)(B).

116.

Because Defendants acted willfully and maliciously in misappropriating and using NeuroRestorative's trade secrets and other confidential and proprietary information, NeuroRestorative is entitled to exemplary damages in an amount equal to twice the amount of any actual damages and unjust enrichment damages awarded, as provided by 18 U.S.C. § 1836(b)(3)(C).

117.

As a further result of Defendants' willful and malicious violations of the DTSA, NeuroRestorative is entitled to an award of attorneys' fees and litigation expenses, as provided by 18 U.S.C. § 1836(b)(3)(D).

## FIFTH CAUSE OF ACTION:
## VIOLATION OF LOUISIANA UNFAIR TRADE PRACTICES ACT

### (AGAINST ALL DEFENDANTS)

118.

NeuroRestorative re-alleges and incorporates by reference all allegations set forth in the preceding paragraphs.

119.

Defendants have engaged in false, misleading, or deceptive practices by misappropriating NeuroRestorative's trade secrets and other confidential and proprietary business information and using it to launch a competing business modeled after NeuroRestorative, unlawfully divert NeuroRestorative's long-time participants, and improperly recruit NeuroRestorative's employees.

120.

In addition, Defendants deliberately selected a name for their competing business that was designed to, and which did, in fact, confuse NeuroRestorative's patients, family members, legal representatives, medical providers, and funding sources into believing that Neuro RehabCare's facility is somehow affiliated with NeuroRestorative.

121.

Defendants' conduct constitutes unfair trade practices in violation of the Louisiana Unfair Trade Practices Act ("LUTPA"), La. Rev. Stat. § 51:1405, *et seq*.

122.

NeuroRestorative's counsel is providing written notice of the filing of this Complaint to the Louisiana Attorney General, as required by La. Rev. Stat. § 51:1409(B), and NeuroRestorative is therefore entitled to recover treble damages for any further violation of the Act committed by Defendants.

## SIXTH CAUSE OF ACTION:  CONVERSION

### (AGAINST ALL DEFENDANTS)

123.

NeuroRestorative re-alleges and incorporates by reference all allegations set forth in the preceding paragraphs.

124.

The Individual Defendants knowingly and willfully maintained wrongful possession of NeuroRestorative's property—namely, the trade secrets and other valuable confidential information they obtained by virtue of their employment with the Company.

125.

The Individual Defendants exercised dominion and control over NeuroRestorative's property by downloading the company's trade secrets and other highly confidential and proprietary information prior to their planned resignations, and then ultimately using such secrets and information to unlawfully divert NeuroRestorative's long-time participants and recruit NeuroRestorative's employees.

126.

Neuro RehabCare knew or should have known that the aforementioned materials and information were the property of NeuroRestorative, and that the Individual Defendants were not

authorized to possess, disclose, or use such materials or information after resigning from NeuroRestorative.

127.

Neuro RehabCare exercised dominion and control over NeuroRestorative's property by knowingly accepting the misappropriated trade secrets and other highly confidential information from the Individual Defendants and then using such secrets and information to unfairly compete with NeuroRestorative.

128.

Defendants' wrongful acts have caused NeuroRestorative to suffer damages, including, but not limited to, the loss of its trade secrets, lost revenue and profits, damage to business reputation, and loss of client goodwill.

## SEVENTH CAUSE OF ACTION:
## <u>VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT</u>

### (AGAINST INDIVIDUAL DEFENDANTS)

129.

NeuroRestorative re-alleges and incorporates by reference all allegations set forth in the preceding paragraphs.

130.

NeuroRestorative servers are protected computers that are used in or that affect interstate commerce.

131.

The Individual Defendants used their Company-issued laptops and mobile devices to download numerous files containing trade secrets and other highly confidential and proprietary

information from NeuroRestorative's servers, which they subsequently emailed to their personal email accounts with the intention of using such files and information to unfairly compete with NeuroRestorative.

132.

The Individual Defendants did not have authorization to access NeuroRestorative's servers for the purpose of downloading files containing the Company's trade secrets and other confidential information in order to use them to unfairly compete with NeuroRestorative.

133.

By accessing the Company's servers to download files containing NeuroRestorative's trade secrets and other confidential information for the purpose of unfairly competing with NeuroRestorative on behalf of Neuro RehabCare, the Individual Defendants intentionally accessed a protected computer without authorization and/or in excess of their authorized access, in violation of the Computer Fraud and Abuse Act ("CFAA").

134.

The Individual Defendants' unlawful acts have caused NeuroRestorative to suffer economic loss in excess of $5,000 for a 1-year period, including, but not limited to, the costs associated with retaining a data recovery service to image and analyze the contents of their Company-issued laptops and mobile devices, as well as other costs associated with responding to the offense.

135.

NeuroRestorative is entitled to recover compensatory damages for the economic losses it suffered as a direct and proximate result of the Individual Defendants' unlawful acts.

136.

In addition, NeuroRestorative is entitled to injunctive relief to prevent any further use and/or disclosure of its trade secrets and other confidential information, as provided by 18 U.S.C. § 1030(g).

## EIGHTH CAUSE OF ACTION:  CONSPIRACY
### (AGAINST ALL DEFENDANTS)

137.

NeuroRestorative re-alleges and incorporates by reference all allegations set forth in the preceding paragraphs.

138.

Under Louisiana law, a party who conspires with another to commit an intentional and unlawful act is solidarily liable for any damages caused by that act.  La. Civ. Code art. 2324(A).

139.

Neuro RehabCare conspired with the Individual Defendants to misappropriate and convert NeuroRestorative's trade secrets, unlawfully divert its long-time participants, and wrongfully solicit its employees to terminate their relationships with NeuroRestorative and join Neuro RehabCare.

140.

NeuroRestorative has incurred damages as a direct and proximate result of the Individual Defendants' unlawful actions and the plan developed by Defendants, including, but not limited to, the loss of its trade secrets, lost revenue and profits, damage to business reputation, and loss of client goodwill.

141.

Defendants are solidarily liable for the damages caused by their intentional and willful acts.

## JURY DEMAND

NeuroRestorative demands a jury trial on all issues so triable.

## RELIEF SOUGHT

WHEREFORE, Plaintiff, MENTOR ABI, LLC *d/b/a* NeuroRestorative Louisiana, prays that its Complaint be deemed good and sufficient, and after due proceedings are had, that judgment be entered in its favor, and against Defendants, and that the Court award NeuroRestorative all relief to which it is entitled, including, but not limited to:

a. A preliminary and permanent injunction prohibiting the Individual Defendants from soliciting or recruiting NeuroRestorative's employees;

b. A preliminary and permanent injunction prohibiting Defendants from utilizing any confidential information in their possession to unfairly compete with NeuroRestorative or solicit NeuroRestorative's clients;

c. A preliminary and permanent injunction ordering Defendants to return any property, information, or materials belonging to NeuroRestorative;

d. An award of all damages—including all consequential damages, whether foreseeable or not—suffered by NeuroRestorative as a result of Defendants' breach of contract;

e. An award of damages based on Defendants' deliberate and unlawful retention, use, and/or disclosure of NeuroRestorative's trade secrets and other confidential information, in violation of Louisiana law and/or their Confidentiality and Non-Disclosure Acknowledgments with NeuroRestorative;

f. An award of damages for any unjust enrichment Defendants have received as a result of their acts of misappropriation that is not otherwise accounted for in the damages awarded for NeuroRestorative's actual loss, as provided by 18 U.S.C. § 1836(b)(3)(B) and La. Rev. Stat. § 51:1433;

g. An award of damages against the Individual Defendants for breaching their fiduciary duties to NeuroRestorative;

h. An award of treble damages against Defendants for violations of the Louisiana Unfair Trade Practices Act;

i.  An award of exemplary and punitive damages against Defendants for violations of the Federal Defend Trade Secrets Act;

j.  An award of damages against the Individual Defendants for violations of the Computer Fraud and Abuse Act;

k.  An award of attorney's fees and costs, pre-judgment and post-judgment interest, and all other expenses recoverable herein; and

l.  All other legal and equitable relief to which NeuroRestorative may be entitled.

Respectfully submitted,

 /s/ Timothy H. Scott
**TIMOTHY H. SCOTT**
Louisiana Bar No. 21373
**WM. BRIAN LONDON**
Louisiana Bar No. 33948
**FISHER & PHILLIPS LLP**
201 St. Charles Ave., Suite 3710
New Orleans, LA 70170
Telephone: (504) 522-3303
Facsimile: (504) 529-3850
Email:  tscott@fisherphillips.com
Email:  blondon@fisherphillips.com

**Counsel For Plaintiff**